**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------X
MARTIN TREMBLAY,                           :
                                                              08 Civ. 7030(JFK)
          Petitioner,                      :          05 Cr. 0783 (JFK)

     -against-                             :          **MEMORANDUM OPINION**
                                                                  **& ORDER**
UNITED STATES OF AMERICA,                  :

          Respondent.                      :
----------------------------------X

**JOHN F. KEENAN**, **United States District Judge**:

### INTRODUCTION

        On November 20, 2006, Petitioner Martin Tremblay ("petitioner" or "Tremblay") pled guilty, pursuant to a plea agreement, to one count of money laundering in violation of 18 U.S.C. § 1956(a)(3)(B).  The petitioner currently is serving a prison sentence of 48 months, imposed by this Court on March 14, 2007.  He brings this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, seeking to vacate, set aside, or correct his sentence.  Tremblay requests relief on the grounds that (1) he did not commit a crime, despite his guilty plea; (2) he did not understand the offense at the time of his guilty plea due to ineffective assistance of counsel; and (3) the prosecutor failed to present exculpatory information to the grand jury.  For the reasons set forth below, the petition is denied.

### BACKGROUND

        The following facts are taken from the parties'

submissions in connection with this petition and are undisputed except where noted.

    (a) <u>Investigation and Arrest</u>

       Tremblay, a Canadian national living in the Bahamas, was the director of Dominion Investments ("Dominion"), an investment firm based in the Bahamas. The New York Drug Enforcement Strike Force ("the "Strike Force") carried out an investigation into Tremblay and Dominion, an investigation spanning several years and aimed at assessing the legitimacy of Dominion's offshore financial services. The investigation revealed ties between Dominion and known criminals. Specifically, the investigation revealed instances where international narcotics traffickers, pyramid schemers, stock fraudsters, and tax evaders used accounts set up by Tremblay and Dominion to launder the proceeds of their crimes. According to the investigation, Tremblay's money laundering scheme involved setting up shell corporations with fictitious nominees and trustees. Tremblay or other Dominion employees would serve as "President" or "Secretary" of these corporations to disguise the real owners of the funds deposited in the accounts.

       For his part, Tremblay maintains in the instant petition that Dominion "operated in an open and transparent fashion" and that most Dominion clients used its services for legitimate investment management, asset protection, and tax planning. While Dominion had "its share of undesirable clients," Tremblay states that Dominion always reported suspicious activity to relevant

authorities and cooperated with investigations into its clients.

Based on the findings from the investigation into Tremblay and Dominion, the Strike Force started an undercover operation in January 2005. The undercover operation began with a confidential informant (the "CS") contacting Tremblay and asking if he would be interested in working with the CS's client. Tremblay agreed to open a new account for the CS's client, and in February 2005, undercover agents began corresponding with Tremblay by e-mail.

On March 19, 2005, Tremblay met in Manhattan with the CS and an undercover agent ("UC-1") who was posing as the CS's client. The Strike Force videotaped and audio recorded the meeting. At this initial meeting, UC-1 informed Tremblay that he sought to launder the proceeds of narcotics trafficking through bank accounts that would be set up by Tremblay. Tremblay maintains in the instant petition that he made it clear at the meeting that he would not participate in money laundering and that the meeting ended without an agreement. Tremblay recounts ending the meeting by saying he would call back the client if he could help. According to Tremblay, he never called UC-1.

In April 2005, a second undercover agent ("UC-2") contacted Tremblay about opening a bank account in the Bahamas for his and UC-1's funds. Tremblay explained to UC-2 that they would need to incorporate a company in order to open a bank account, and that he wanted to use Arnold Forbes, a lawyer he had worked with

before, to incorporate the company.

Initially, Tremblay told UC-2 that he would not manage the account, but would only be tangentially involved with it. However, on April 13, 2005, Tremblay faxed to UC-2 in New York the incorporation documents for the company he had discussed with UC-2 (as the prerequisite for opening a bank account). Tremblay informed UC-2 that, once the company was incorporated, Forbes would open the related bank account. Tremblay instructed UC-2 to tell Forbes that UC-2 had a cash-generating business in New York City and needed an account to deposit the cash. When UC-2 expressed concern over Forbes' knowledge and involvement with the account, Tremblay advised UC-2 to be careful when explaining his cash-only business arrangement to Forbes. Tremblay also said that he would manage and supervise the account, and informed UC-2 that the management fee was about one percent.

Next, Tremblay began to instruct UC-2 on using his account with Forbes. These instructions included recommendations for the least suspicious way to transfer money into the account. Specifically, Tremblay recommended that UC-2 send a total of approximately $100,000 to $150,000 every few months, but that UC-2 send no more than $50,000 at a time into the account. Over the next few months, Tremblay communicated often with UC-1 and UC-2 regarding account paperwork and wiring money into the account.

On May 23, 2005, agents wired $20,000 in funds to the Dominion account from "F.I.D. Industries". UC-1 and Tremblay

4

subsequently confirmed this transaction by e-mail.   In October 2005, UC-1 sent another wire transfer – this time $200,000 – to Dominion accounts.

Tremblay, on the other hand, characterizes his interactions with UC-1 and UC-2 between March and October 2005 as "relentless harass[ment] . . . to get him involved" in managing the account.   Tremblay maintains in the instant petition that the agents initiated every one of the approximately fifty communications he made with the agents throughout the undercover investigation.   Tremblay asserts that when exchanging e-mails in June 2005 regarding the $20,000 transfer, he asked UC-1 for the source of the funds, and the agent responded "F.I.D. Industries" and provided a Manhattan address.   Tremblay also maintains that, in October 2005, he was contacted twice by UC-2 to transfer money to the Bahamas but refused to make both these transfers.   Finally, Tremblay maintains that the $200,000 transfer in October 2005 was deposited into UC-1's own account, not into a Dominion account. Tremblay claims he was not aware of this transfer and played no part in opening the account into which the $200,000 was deposited.

Strike Force agents arrested Tremblay in January 2006, while he was on his way to a second meeting with the CS.

(b) <u>Indictment</u>

Indictment S1 05 Cr. 783 (the "Indictment") was filed on or about January 17, 2006, charging Tremblay in three counts.

Count One charged him with participating in a money laundering conspiracy from 1998 through December 2005, in violation of 18 U.S.C. § 1956(h).  As part of this "historical" money laundering conspiracy, a conspiracy spanning seven years and multiple clients, Tremblay allegedly used Dominion to launder millions of dollars of illegal proceeds.  Count Two charged Tremblay with conspiring to commit money laundering from January 2005 through December 2005 by agreeing, during the undercover sting operation recounted above, to launder the proceeds of a narcotics trafficking business, in violation of 18 § U.S.C. 1956(h).  Count Three charged him with money laundering in connection with the undercover operation, in violation of 18 § U.S.C. 1956(a)(3)(B).

(c) <u>Guilty Plea</u>

On November 20, 2006, Tremblay pled guilty to Count Three of the Indictment – the substantive money laundering count relating to the undercover sting operation.  Before accepting Tremblay's plea, the Court placed him under oath and conducted a hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure. Tremblay confirmed that he had discussed the case fully with his attorneys and that he was satisfied with his attorneys' representation.  Tremblay also affirmed that he had reviewed the charges of the Indictment and fully understood them.  Next, the Court ensured that Tremblay understood that he had the right to go to trial, where he would have the assistance of counsel and would

be presumed innocent unless and until the government proved his guilt beyond a reasonable doubt. The Court also explained all the rights Tremblay would enjoy at trial, and Tremblay said he understood those rights.

The Court then informed Tremblay about the consequences of his guilty plea. The Court discussed with Tremblay, at length, the particulars of the plea agreement he had entered into with the government, including his stipulated Guidelines range of 70 to 87 months; his ineligibility for a safety valve; and his inability to withdraw his guilty plea even if dissatisfied with his sentence. The plea agreement also waived Tremblay's right to challenge, either on direct appeal or through a § 2255 petition, any sentence within or below the stipulated Guidelines range. When asked at the plea hearing whether he agreed not to appeal any sentence within or below this range, Tremblay answered "Yes" two times, once in response to the government, and once in response to the Court. (Plea Tr. at 14-15).

Next, the Court confirmed for a second time that Tremblay was satisfied with his attorneys' representation. Tremblay then stated that he was pleading guilty of his own free will, and that he had not been induced to plead guilty by pressure, fear, threat or force. He confirmed that he was pleading guilty because in truth and in fact he was guilty. Finally, Tremblay described in this own words his involvement in the charged offense:

> In March 2005, in New York City, I met with individuals
> who turned out to be government agents. During that
> meeting, these individuals requested my assistance in
> laundering the proceeds of drug dealing. They told me
> that they had invested narcotics trafficking proceeds in
> a number of businesses. In May 2005, I received a wire
> transfer from one of those businesses in the amount of
> $20,000, and I knew that it was wrong.

(Plea Tr. at 18). The Court then accepted Tremblay's guilty plea.

    (d) <u>Sentencing</u>

        After the plea, the United States Probation Office prepared a presentence report ("PSR"). The PSR calculations produced a recommended adjusted offense level of 27, which, combined with a Criminal History Category of I, yielded an advisory Sentencing Guidelines range of 70 to 87 months' imprisonment. The calculations matched those agreed upon in Tremblay's plea agreement with the government.

        The Court sentenced Tremblay on March 14, 2007. During the sentencing hearing, the Court ensured that he and his attorneys had reviewed and discussed the PSR and raised any desired factual objections to it. After hearing from the defense, the government, and Tremblay himself, the Court sentenced Tremblay to a term of 48 months' imprisonment – a sentence 22 months below the minimum advisory Guidelines range.

        Tremblay currently is serving his prison term. He filed the instant petition *pro se* on July 14, 2008.

**DISCUSSION**

Petitioner seeks habeas relief on three grounds: (1) his actions did not constitute the offense of money laundering; (2) his guilty plea was unknowing and involuntary because his attorneys failed to properly advise him of the charge; and (3) the prosecutor failed to disclose exculpatory evidence to the grand jury.

(1) Commission of a Crime

Tremblay first argues that he was not guilty of money laundering, despite his guilty plea, because his actions did not meet the concealment element of the offense.  Tremblay maintains that the $20,000 transfer (the only transfer he admits receiving from the undercover agents) "was transparent, using a straight-forward wire transfer and there was no attempt to avoid a paper trail, no co-mingling of funds, no cash, no convoluted serie[s] of transfer[s] between multiple accounts, no secret meeting or coded language, no design, plan or method to conceal anything." (Pet'r Reply Mem. 6-7).

A guilty plea is valid if "the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." United States v. Maher, 108 F.3d 1513, 1524 (2d Cir. 1997).  The court's Rule 11 inquiry need not "weigh any evidence or predict what a jury would do with the case." United States v. Smith, 160 F.3d 117, 121 (2d Cir. 1998).  In assessing the validity of a defendant's guilty

9

plea, the court need not "be satisfied that a jury would return a verdict of guilty" or even find that "it is more likely than not that the defendant is guilty." <u>Maher</u>, 108 F.3d at 1524.  Indeed, the defendant's admissions may be sufficient by themselves to form an adequate factual basis for a guilty plea. <u>See</u> <u>Irizarry v. United States</u>, 508 F.2d 960, 968 (2d Cir. 1975) (finding that the court properly assessed the validity of defendant's guilty plea based "solely" on defendant's "admissions at the time of the plea").  In addition to the defendant's allocution, the court may rely on any facts on the record at the time of the plea proceeding to assess the validity of the plea. <u>See</u> <u>United States v. Andrades</u>, 169 F.3d 131, 136 (2d Cir. 1999) (explaining that court may rely on the defendant's admissions, information from the government, "or other information appropriate to the specific case").

The offense of money laundering requires proof of three elements:  (1) that the defendant unlawfully, willfully, or knowingly conducted or attempted to conduct a financial transaction affecting interstate or foreign commerce; (2) that the transaction or attempted transaction involved property represented to be, and believed by the defendant to be, the proceeds of some form of unlawful activity; and (3) that the defendant engaged or attempted to engage in the transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property. <u>See</u> 18 U.S.C. § 1956(a)(3)(B).  Here, Tremblay argues that he

10

committed no crime because there was no evidence that he intended
to disguise or conceal the illegal source or origin of the funds
wired into Dominion accounts by undercover agents.   All of the
cases Tremblay cites to support his argument, however, involved
defendants who did not plead guilty to money laundering but were
convicted after trial.  While some of these cases addressed the
concealment element of money laundering – the element Tremblay
disputes – each of them concerned whether there was sufficient
evidence of concealment to sustain a conviction by a jury verdict.
Tremblay's conviction, however, must be evaluated under the far
less stringent Rule 11 standard.

Under the Rule 11 standard, Tremblay's admissions at the
guilty plea provide a sufficient factual basis to conclude that he
committed all elements of the offense of money laundering.  In his
plea allocution, Tremblay stated that the undercover agents
"requested [his] assistance in laundering the proceeds of drug
dealing" and "told [him] that they had invested narcotics
trafficking proceeds in a number of businesses". (Plea Tr. at 18).
This part of Tremblay's statement corresponds to the second element
of the offense – the use of illegal proceeds.  Knowing that these
businesses used proceeds of illegal activity, Tremblay nevertheless
"received a wire transfer from one of those businesses in the
amount of $20,000, and [he] knew that it was wrong." (Plea Tr. at
18).  This part of Tremblay's statement corresponds to the first

element of the offense – knowingly conducting a transaction.  It also corresponds to the third element of the offense.  By receiving illegal funds into an account he had set up for that purpose, knowing that he was providing "assistance in laundering the proceeds of drug dealing" and that "it was wrong" to do so, Tremblay showed intent to disguise or conceal the nature and source of the illegal funds.  Accordingly, this statement, in itself, forms an adequate factual basis for a money laundering guilty plea.

     In addition to Tremblay's own words, there was ample direct evidence in the record to support the validity of his guilty plea.  Tremblay's recorded meeting with the undercover agents demonstrates that he knew the agents were planning to launder the proceeds of money laundering through a fictitious company's bank accounts that would be set up by him.  Tremblay subsequently helped the agents open a bank account for this purpose and managed the account.  In regard to the concealment element of money laundering in particular, Tremblay also instructed the agents on how much to reveal to Forbes about the illicit proceeds of their businesses, and on how to transfer funds into the account in unsuspicious ways.  Based on Tremblay's admissions and direct evidence in the record, there was an adequate factual basis for his guilty plea.

          (2) <u>Voluntariness and Knowingness of Guilty Plea</u>

     As a related argument, Tremblay contends that, at the time of his guilty plea, he did not understand that intent to

12

conceal was an element of the money laundering offense.  Tremblay alleges that his counsel incorrectly explained to him that "receiving funds that [were] connected to an unlawful origin was enough to constitute the offense of money laundering." (Pet'r Mem. 3).  This misinformation, Tremblay claims, renders his guilty plea unknowing and involuntary.

Courts apply the framework in Strickland v. Washington, 466 U.S. 668 (1984), to evaluate a section 2255 claim that a guilty plea was involuntary or unknowing due to the ineffective assistance of counsel. United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001) (citing Hill v. Lockhard, 474 U.S. 52, 57-58 (1985) (applying Strickland to the context of guilty pleas)).  The defendant bears the burden of showing that:  (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for the counsel's errors, [defendant] would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

A plea agreement is valid if it is a knowing and voluntary act "done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970).  A plea is "knowing" if the defendant is fully aware of and appreciates its potential consequences. United

States v. Ready, 82 F.3d 551, 557(2d Cir. 1009).    A plea is entered into voluntarily if it is free of any threats and not obtained by any promises on behalf of the government or with any exertion of improper pressure.  Brady, 397 U.S. at 753.

The record conclusively establishes that Tremblay understood all relevant circumstances surrounding his guilty plea, including the elements of the offense to which he was pleading guilty, and what conduct that offense entailed.    Tremblay testified under oath at the Rule 11 proceeding that he reviewed the charges in the Indictment with counsel and that he fully understood the charges.  The Indictment clearly lays out the elements of money laundering, including the concealment element — i.e., that the financial transaction be conducted "with the intent to conceal and disguise the nature, location, source, ownership and control of property represented to be, and believed to be, the proceeds of specified unlawful activity, to wit, narcotics trafficking." (Indictment § 13.)

At the Rule 11 proceeding, Tremblay further confirmed that he was pleading guilty because in truth and in fact he was guilty.  He then described in his own words his involvement in money laundering, recounting facts relating to every element of the offense, including the intent or concealment element.    Tremblay did not merely receive funds, as he now claims, but he did so in order to assist undercover agents "in laundering the proceeds of

14

drug dealing." (Plea. Tr. at 18).

Tremblay's sworn statements at his guilty plea belie his present claim that he did not understand the nature of the crime to which he was pleading guilty. Those statements create a presumption that his plea was knowing and voluntary, a presumption that is not overcome by vague and unsupported assertions that his attorneys failed to properly advise him of the charge. See Blackedge v. Allison, 431 U.S. 63, 73 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); United States v. Hernandez, 242 F.3d 110, 112-13 (2d Cir. 2001) (finding that the petitioner's conclusory allegation that he was "misled about the consequences of his guilty plea by his attorney" did not overcome the presumption, created by his sworn statements made in open court, that his guilty plea was knowing, voluntary, and made after extensive discussion with his attorney); United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987) (stating that claims resting on "airy generalities" and "conclusory assertions" are insufficient to sustain a claim under 28 U.S.C. § 2255); Matura v. United States, 875 F. Supp. 235, 237-38 (S.D.N.Y. 1995) (finding that petitioner's conclusory assertions of ineffective assistance, without any allegations of fact to support the assertions, fail "to establish that his counsel's performance was deficient [and] . . . fail [] to overcome

15

the presumption [under Strickland] that counsel acted reasonably .
. . .”); Sirotnikov v. United States, No. 97 Civ. 3295 (JFK), 1998
WL 770557, at *4 (S.D.N.Y. Nov. 2, 1998)(“Petitioner’s naked
assertion that his trial counsel ‘failed to adequately perform
pretrial research and investigation’ does not establish ineffective
assistance of counsel.”).   Therefore, Tremblay cannot establish
either prong of a Strickland claim.

(3)   The Prosecutor’s Disclosure Obligations

Tremblay’s third ground for requesting habeas relief is
prosecutorial misconduct.   Tremblay alleges that the prosecutor
failed to disclose exculpatory evidence to the grand jury, in
violation of his Giglio and Brady obligations.   Tremblay bases this
claim on the statements made by a co-conspirator, Daniel Pelchat,
in a 2007 Canadian newspaper article and in a 2002 meeting with the
Royal Canadian Mounted Police.   In both situations, Pelchat
allegedly said that Tremblay was not aware of any illegal activity
in which Pelchat had participated.   According to Tremblay, had this
information been disclosed to the grand jury, the grand jury could
not have found that probable cause existed to support the charge of
conspiracy to commit money laundering.

This claim fails for at least three reasons.   First, even
assuming that the information identified by Tremblay is
exculpatory, the government has no obligation to present
exculpatory evidence to the grand jury.   See United States v.

<u>Williams</u>, 504 U.S. 36, 51-52 (1992) (finding that a district court may not dismiss an otherwise valid indictment on the ground that the government failed to disclose "substantial exculpatory evidence" to the grand jury); <u>United States v. Regan</u>, 103 F.3d 1072, 1081 (2d Cir. 1997) (finding that the government has "no obligation to present exculpatory material to a grand jury"). Second, Tremblay's guilty plea cured any possible deficiency in the grand jury proceeding.  "Having admitted to the factual basis of the charges against him upon entering a plea of guilty, any error in the proceeding which led to his indictment is . . . rendered harmless, and is not a cognizable claim in a federal habeas proceeding." <u>Lloyd v. Walker</u>, 771 F. Supp. 570, 576-77 (E.D.N.Y. 1991); <u>see also</u> <u>Alston v. Ricks</u>, No. 01 Civ. 9862 (GWG), 2003 WL 42144, at *7 (S.D.N.Y. Jan. 3, 2003) (holding that guilty plea precluded petitioner's claim regarding prosecutorial misconduct before the grand jury); <u>United States v. Sullivan</u>, No. 05-CV-6060L, 2007 WL 2746900, at *8 (W.D.N.Y. 2007) ("[W]here a habeas petitioner has entered a voluntary and knowing guilty plea while represented by competent counsel, any non-jurisdictional defects, including defects with regard to grand jury proceedings, are waived.").

Finally, the plea agreement expressly waives any collateral challenge based upon the government's alleged failure to produce exculpatory information.  The agreement provides in relevant part:

17

> By entering this plea of guilty, the Defendant waives any and all right to withdraw his plea or to attack his conviction, either on appeal or collaterally, on the ground that the Government has failed to produce any discovery material, Jencks Act material, exculpatory material pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment materials pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), that have not already been produced as of the date of the signing of this Agreement.

Such waivers are enforceable where, as here, the defendant entered into the plea agreement knowingly and voluntarily. <u>See</u> <u>United States v. Kraft</u>, No. 06 Cr. 1221 (LAP), 2007 WL 2746897, at *1-2 (S.D.N.Y. Sept. 19, 2007).

The government further argues that Tremblay's prosecutorial misconduct claim fails because (1) Pelchat's statements to the government were not exculpatory, (2) the grand jury would have issued the indictment even if presented with Pelchat's statements; and (3) Tremblay was aware of Pelchat's statements before pleading guilty. These arguments are forceful but need not be reached because the government had no obligation to present exculpatory evidence to the grand jury in the first place, Tremblay's guilty plea cured any possible deficiency in the grand jury proceedings, and Tremblay knowingly and voluntarily waived his right to raise this claim in a habeas petition.

(4) <u>Waiver</u>

As a final note, Tremblay waived his right to

18

collaterally attack his sentence, and this waiver provides a separate ground to dismiss his habeas petition in its entirety. In the plea agreement, Tremblay expressly agreed not to "file a direct appeal, or litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence at or below the Stipulated Guidelines Range of 70 to 87 months."  When a defendant signs a plea agreement containing a waiver of the right to file a habeas petition, the waiver is enforceable provided that the plea agreement was "entered into knowingly and voluntarily, and with awareness of his waiver of . . . collateral attack." <u>Garcia-Santos v. United States</u>, 273 F.3d 506, 508 (2d Cir. 2001); <u>see also</u> <u>United States v. Ready</u>, 82 F.3d 551, 557 (2d Cir. 1996); <u>United States v. Gumbs</u>, 8 F. Supp. 882, 883 (2d Cir. 1998).  At the Rule 11 Proceeding, Tremblay confirmed that he had reviewed the plea agreement with his attorneys, that he had no questions concerning it, and that he understood the waiver.  Even now, he does not claim to have misunderstood the terms of the plea agreement.  In consideration for his guilty plea to Count Three, the government dismissed the charge relating to the historical money laundering conspiracy.  Tremblay then received a sentence 22 months below the minimum of the advisory Guidelines range.  Having secured the benefits of the plea bargain, Tremblay cannot now assert rights that he knowingly and voluntarily waived in consideration for those benefits.  "Such a remedy would render the plea bargaining process and the resulting agreement meaningless." <u>United States v. Salcido-</u>

Contreras, 990 F.2d 51, 53 (2d Cir. 1993) (per curiam).

## Conclusion

For the reasons set forth above, Tremblay's petition pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence is denied. This Court will not grant a certificate of appealability because petitioner has not made a "substantial showing of the denial of a constitutional right." Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983), superseded on other grounds by 28 U.S.C. 2253(c)(2)). Tremblay has the right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253; Miller-El v. Cockrell, 537 U.S. 322 (2003). Copies of all unreported or unofficially-reported decisions cited above are being provided to petitioner along with this order. See Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009). This case is closed.

SO ORDERED.

Dated:        New York, New York
              April 20, 2009

                              _John F. Keenan_

                              JOHN F. KEENAN
                         United States District Judge